In the Matter of FRANK B. VERMILYA, an Attorney, Respondent.

First Department, July 6, 1925.

**Attorney and client — disciplinary proceedings — attorney disbarred for converting money of clients and trust funds.**

An attorney at law is disbarred for converting money of his clients, and for converting the money of a trust fund, though he made restitution after summary proceedings had been instituted against him.

DISCIPLINARY proceedings instituted by the Association of the Bar of the City of New York.

*Einar Chrystie,* for the petitioner.

Respondent in person.

CLARKE, P. J.:

The respondent was admitted to practice as an attorney and counselor at law in the State of New York at the June, 1898, term of the Appellate Division, First Department, and has practiced as such attorney since his admission. He is charged with mis-

conduct as an attorney, the petition setting forth five separate charges. The first charge is that in February or March, 1920, the respondent was retained by one Francis H. Grefe, Jr., as his attorney to attend to legal matters in which said Grefe was interested either personally or as one of the executors and trustees of the last will and testament of Francis H. Grefe, Sr., deceased; that the said Grefe, Jr., consulted this respondent as to whether it was lawful for him as executor and trustee of his father's estate to loan to himself individually the sum of six thousand five hundred dollars of the funds of the estate, secured by first mortgage on property which Grefe intended to purchase; that respondent advised that such loan was legal and proper, and prepared a bond and mortgage on certain property, and said Grefe executed the said bond and mortgage and delivered the same to respondent to have it recorded, and on August 28, 1922, gave to the respondent a check for the sum of thirty-five dollars for the purpose of paying the mortgage tax and recording fee. It is not disputed by the respondent that he gave such advice and prepared the mortgage and received the proceeds of the check. It was subsequently ascertained that the mortgage had not been recorded. On March 6, 1923, Grefe made a demand on respondent for the return of the thirty-five dollars, and was then informed that respondent had occasion to look up the question whether such a mortgage was legal and had come to the conclusion that it was not a proper investment to make, and for that reason he had not filed the mortgage.

On or about the 21st of May, 1923, summary proceedings were instituted in the Supreme Court to compel the respondent to return the thirty-five dollars, and an order to show cause was granted and served upon him, and after such service the respondent repaid the money, approximately nine months from the date of his receipt of the same.

The second charge was that in July, 1918, one George J. Heilig was appointed general guardian of his infant daughters; that respondent was retained by said Heilig in the management of the estate; that between January 20, 1920, and September 1, 1922, Francis H. Grefe, Jr., paid over to the respondent as such attorney for Heilig, the general guardian, the sum of $9,525.86; that the respondent failed to pay over to Mr. Heilig the greater part of the amounts so received by him, and refused to disclose where the money was invested; that after numerous demands were made, summary proceedings were instituted against the respondent by the service of an order to show cause on July 16, 1923; that after several adjournments respondent finally submitted an account which was accepted by the petitioners, and paid over the sum of

$8,188.19, retaining $335 for his own services as attorney for the guardian. The learned official referee reports that respondent did nothing to account for the moneys that had come into his hands until after the summary proceedings had been instituted; nor is it disputed that the amounts so received by the respondent were mixed with his own personal account in the bank, and from time to time he withdrew sums, so that his balance at times was very small.

The third charge is that in June or July, 1921, the respondent was retained by Francis H. Grefe, Jr., Albert Leibman, Louis H. Schulmerich and William B. Schroeter to represent them in the purchase of the tool and supply department of E. P. Reichhelm & Company, Inc., the respondent representing both the seller and purchasers; that he was then instructed by his clients to incorporate a company under the laws of the State of New York, to be known as "Anchor Tool and Supply Company, Incorporated;" that on or about July 28, 1921, the respondent informed them that the corporation papers had been filed in the office of the Secretary of State and in the office of the county clerk of New York county; and called a meeting to effect the incorporation of this company, that at such meeting the respondent stated that he had filed the certificate of incorporation in the office of the Secretary of State and a duplicate original in the office of the county clerk of New York. The respondent then submitted a bill for services in the sum of $337.37, less $125 previously paid, and received payment on August 10, 1921. In this bill respondent recited disbursements made by him in connection with the incorporation as follows: "Secretary of State, $35; State Treasurer, $50; county clerk, $2.12; revenue stamps, $30; seal, minute book, certificate book, etc., $20.25."

About one year later investigation disclosed that no certificate of incorporation of the Anchor Tool and Supply Company, Inc., had been filed in the office of the Secretary of State or in the county clerk's office. Subsequently the officers of this company procured a proper incorporation. Demand was made on the respondent for the return of the $337.37, and on his failure to return this sum summary proceedings were instituted against him in the Supreme Court. On June 25, 1923, an order was made directing the repayment of this sum.

The learned official referee reports that the evidence clearly shows that the respondent utterly failed to file the incorporation papers for which he had submitted a bill to his clients for disbursements, and refused to return the money thus paid him until long after the order in summary proceedings against him, which

was dated on the 25th of June, 1923; that he complied with the order on the 31st day of July, 1923, that he admitted in his examination that the incorporation papers had not been filed, but claimed he could not account for it.

The fourth charge is that on July 1, 1922, the respondent, while acting as attorney for Francis H. Grefe, Jr., received from Grefe a check to his order for eighty-two dollars and fifty cents for the purpose of paying the bill of the Title Guaranty and Trust Company for services rendered in the examination of title and the issuance of a title insurance policy on property on East Fifteenth Street, Brooklyn, which had been purchased by Grefe, that Grefe did not receive the policy until November, 1922, when he was informed by the title company that their bill had not been paid, and on November 14, 1922, he paid eighty-two dollars and fifty cents to the title company and then secured the policy.

The learned official referee reports that the evidence clearly shows that not only did the respondent receive the eighty-two dollars and fifty cents for disbursements, as he claimed, that were owing to the title company, but also that he stated to the title company that he had not received the money from his client.

It further appears that on July 27, 1922, the respondent received the sum of $100 for services in connection with the purchase of this lot; and it also appears that the respondent repaid to Grefe the sum referred to on or about the 15th day of November, 1922, having retained the money from July 1, 1922, to November 15, 1922.

The fifth charge is that prior to October, 1922, the respondent represented the Philip Kobbe Company, Inc., in an action against the company by the B. & B. Sign Company in the City Court of New York; that in proceedings on an appeal to the Appellate Term of the Supreme Court in the month of October, 1922, respondent ordered the Court Press, Inc., printers, to print the record on appeal, for which services the company rendered a bill for $226.80, being $204 for printing the record and $22.80 for printing the brief; and although he received the money from his clients for the purpose of paying the bill, he failed to do so until suit had been instituted and a default judgment entered against him.

The learned official referee reports that it clearly appears the respondent received this money from his clients in December, 1922; that in order to collect the money the printing company was compelled to enter a suit against the respondent, which resulted in a judgment in the Municipal Court; and that a supplementary proceeding on said judgment was instituted against the respondent and subsequently the amount was paid.

" From an examination of the evidence adduced to which I have

already referred, it is apparent," says the learned official referee, "that the charges have been proved. In fact, most of them have been conceded by the evidence of the respondent."

We have carefully considered all of the evidence submitted and are satisfied that the conclusions of the learned official referee are sustained by said evidence, and we approve of his report. While the separate amounts of his clients' money, paid to respondent to be used for the benefit of his clients for specific purposes but appropriated to his own use, were not large, it is quite evident that, being in financial straits, he was using his clients' money for his own purposes. It shocks our sense of proper professional conduct to find so many repeated instances of the retention of trust funds until forced to repay by summary proceedings. Evidence of respondent's lack of candor, to say the least, is shown by the testimony of the collector employed by the Title Guaranty and Trust Company. He testified that when the respondent did not pay the bill for eighty-two dollars and fifty cents which was placed in the hands of the witness for collection, he visited respondent a number of times for the purpose of collecting the bill. This witness produced the original bill, upon the back of which he had made notes of his conversations with the respondent immediately after each interview. He refreshed his recollection by referring to these notes, and testified that on August 30, 1922, when he called at the respondent's office, respondent told him that he would write to his client to mail a check to the company (this was two months after Grefe had given the respondent the money to pay the bill); that on September 9, 1922, the respondent told him he had not received a check from his client; that on September 13, 1922, the respondent told him that his client was still out of town; that on September 21, 1922, the respondent told him that his client was still away; that on September 27, 1922, respondent told him that he expected his client back any day; that on October 11, 1922, respondent told him his client was not back yet; that on October 18, 1922, respondent told him he expected his client back on October twentieth; and that on October twentieth respondent told him that he did not get the money from his client.

The testimony in regard to the handling of the trust funds of the infants which were in his hands, given by himself, produces a very painful impression. He claims to have destroyed all his checks and to have had no books of account. The checks given the respondent from time to time by their indorsement show that they were deposited to the credit of the respondent in the Bank of America. The transcript of the account shows that the respondent frequently had a balance far below the amount of the

trust funds which should have been in his possession for the benefit of the Heilig infants. There is no doubt that he mixed the trust funds with his own throughout the transaction, and frequently used the trust funds for his personal benefit instead of subjecting them to the joint control of the guardian and the surety company, as had been agreed.

The record establishes a lack of appreciation of professional duty and responsibility. His own testimony displays, as heretofore indicated, an absolute lack of candor and straightforwardness, and a conversion of his clients' and trust funds to his own use. While there was not an ultimate loss to the infants' estate, yet the manner of dealing with it was utterly unwarranted and extremely dangerous. We are of the opinion, forced by this record, that it would be unsafe to permit the respondent to remain in the profession, and he is, therefore, disbarred.

DOWLING, MERRELL, McAVOY and BURR, JJ., concur.

Respondent disbarred. Settle order on notice.